# In the United States Court of Federal Claims

No. 14-376C
(Filed: November 21, 2014)

* * * * * * * * * * * * * * * * * * * *

PIONEER RESERVE, LLC,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

Clean Water Act; mitigation bank; contract; regulatory function; subject matter jurisdiction

* * * * * * * * * * * * * * * * * * * *

*Douglas E. Kahle*, Virginia Beach, VA, for plaintiff.

*Sarah M. Valenti*, Civil Division, Department of Justice, Washington, DC, with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Stuart F. Delery*, Assistant Attorney General, for defendant. *Milton W. Boyd*, Office of the Chief Counsel, U.S. Army Corps of Engineers, Washington, DC, of counsel for defendant.

---

OPINION

---

BRUGGINK, *Judge*.

Pioneer Reserve, LLC ("Pioneer" or "plaintiff"), presents this court with a breach of contract claim. Defendant, the United States Government, filed a motion to dismiss plaintiff's complaint, contending that plaintiff did not have a contract with the federal government and that we, therefore, do not have subject matter jurisdiction. The matter is fully briefed and we heard oral

argument on November 6, 2014. For the reasons explained below, we deny defendant's motion.

BACKGROUND[1]

Pioneer Reserve, LLC was formed by the Walther family to manage two tracts of valuable land ("the tracts" or "the land") located in Matanuska-Susitna Borough, Alaska that the family acquired in 1998. These tracts of land were capable of being developed and therefore had significant value. The Walther family also suspected that there would be even greater value in preserving the land and selling its status as a preserved natural resource to developers who were required to compensate for the impact their developments elsewhere would have on other natural resources. The framework for this arrangement is set forth in the following statutes and regulation.

I.      The Clean Water Act and Its Implementation Through Regulation

Congress passed the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2012). The Act accomplishes this restoration by prohibiting the discharge of pollutants into bodies of water, *id*. § 1311(a), except by special permit issued by the appropriate federal agency. *Id*. § 1344(a). Thus, if a developer seeks to dredge or dump fill, i.e., discharge pollutants, into the waters, including wetlands,[2] of the United States, it must apply for a permit, which may or may not be granted after a period for public notice and comment. *Id*.

After the developer applies for the permit, the Department of the Army, Corps of Engineers ("Corps"), engages in a public-interest analysis that takes into account measures proposed by the developer to mitigate the unavoidable

---

[1] The facts are taken from plaintiff's complaint, and are presumed correct for the purposes of defendant's motion to dismiss, unless challenged. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

[2] Wetlands are also protected because they "constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1) (2014).

impact to the waters or wetlands. 33 C.F.R. § 320.4(r) (2014). The mitigation may be accomplished on or off the site intended for development, and the Corps may condition the permit upon the implementation of the proposed mitigation. *Id*. § 325.4(a). Additionally, the developer is not required to be the entity that accomplishes the mitigation. Rather, the regulations contemplate an option whereby the developer may secure mitigation "credits" from a third party mitigation bank,[3] which assumes responsibility for the preservation of a piece of land containing natural resources, such as wetlands, in exchange for compensation from the developer. *See id*. § 332.2 ("The operation and use of a mitigation bank are governed by a mitigation banking instrument.").

The mitigation banking instrument[4] ("instrument") features prominently in the process of proposing, approving, and establishing a mitigation bank. The process begins when the entity seeking to establish a mitigation bank, which is referred to as the "sponsor," submits a proposal to the Corps. This proposal must contain the following: a draft mitigation plan describing "the ecological characteristics of the proposed compensatory mitigation project site;" a work-plan for restoring, enhancing, or preserving the resources described; "the number of credits to be provided, including a brief explanation of the rationale for this determination;" and the method of achieving preservation, including any legal arrangements or instruments necessary to ensure the long-term protection of the site. *Id*. § 332.8(c)(1)(iii). The district engineer, on behalf of the Corps, then assembles an Interagency Review Team ("IRT") to review the documents submitted by the sponsor. *Id*. § 332.8(b)(1). "[R]epresentatives from the U.S. Environmental Protection Agency, U.S. Fish

---

[3] A mitigation bank is defined as "a site or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by" a permit issued by the Army Corps of Engineers. 33 C.F.R. § 332.2. "In general, a mitigation bank sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor." *Id*.

[4] "Mitigation bank instrument means the legal document for the establishment, operation, and use of a mitigation bank." 33 C.F.R. § 332.2. "The instrument provides the authorization for the mitigation bank . . . to provide credits to be used as compensatory mitigation for [Department of the Army] permits." *Id*. § 332.8(d)(1).

3

and Wildlife Service, NOAA Fisheries, the National Resource Conservation Service, and other federal agencies, as appropriate, may participate in the IRT." *Id*. § 332.8(b)(2).

The IRT will review the proposal, instrument, "and other appropriate documentation and provide comments to the district engineer" in order "to facilitate the establishment of mitigation banks." *Id*. § 332.8(b)(3). During the IRT review period, the public is also given a 30-day period to comment on the sponsor's proposal. *Id*. § 332.8(d)(5). If the district engineer determines that the proposal has potential, he or she will provide the sponsor with the district engineer's initial evaluation letter along with comments from the public and the IRT. *Id*. § 332.8(d). "After considering comments from the district engineer, the IRT, and the public, if the sponsor chooses to proceed with establishment of the mitigation bank . . . he must prepare a draft instrument and submit it to the district engineer." *Id*. § 332.8(d)(6)(i). The draft instrument must contain the mitigation plan and a credit release schedule. *Id*. § 332.8(d)(6). When the sponsor submits the draft instrument, it triggers one more round of review and comments by the district engineer and the IRT. *Id*. § 332.8(d)(7). The sponsor has the ability to alter the draft instrument to respond to comments. If the feedback during this round of review indicates that the draft instrument is generally acceptable, then the sponsor may submit a final instrument. *Id*.

Submission of the final instrument results in a final round of review by the district engineer and the IRT. *Id*. § 332.8(d)(8). Although the district engineer "retains final authority for approval of the instrument," he or she "will give full consideration to any timely comments and advice of the IRT." *Id*. § 332.8(b)(4). Once the final instrument is approved, the district engineer arranges for the instrument to be signed by the parties. *Id*. § 332.8(d)(8); 33 C.F.R. § 332.8(a)(1) ("All mitigation banks . . . must have an approved instrument signed by the sponsor and the district engineer prior to being used to provide compensatory mitigation" credits.). Members of the IRT also have the option of signing the instrument to "indicate their agreement with the terms of the instrument" or to "submit a letter expressing concurrence with the instrument." 33 C.F.R. § 332.8(b)(3). Once the mitigation banking instrument is signed, the mitigation bank may begin to sell credits according to the agreed-upon credit release schedule.

II. The Process of Establishing the Pioneer Reserve Mitigation Bank

When plaintiff first began contemplating the option of using its land to establish a mitigation bank, it operated under the belief that the Alaska Railroad Corporation was planning to construct an extension of the railroad that would impact wetlands and other water resources. The future railroad extension would be located within the same watershed, or "land area that drains to a common waterway," *id*. § 332.2, as the tracts of land owned by the Walther family. The fact that the proposed railroad extension and the tracts were located within the same watershed was important to plaintiff's calculus regarding future use because the applicable regulations require, as a general proposition, that compensatory mitigation "be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services." *Id*. § 332.8(b)(1).

Believing that the Alaska Railroad Corporation's extension project would generate demand for compensatory mitigation credits, plaintiff considered whether it would be beneficial to become the supplier. To that end, it engaged an environmental consulting firm, Restoration and Science Engineering ("RSE"), to assess the potential use of the land as a mitigation bank. During this assessment period, the Walther family and RSE sought the Corps' opinion about the possible use of the land as a mitigation bank. "Members of the Walther family and RSE met with Corps' representatives, on numerous occasions, including site visits that made detailed findings about the habitats, characteristics, and ecological functions performed by the [l]and." Compl. ¶ 24. After that evaluation, RSE concluded that the land was suitable for preservation and use as mitigation bank because of the land's ecological functions. The Corps similarly determined "that the proposed preservation was appropriate and practicable." Compl. ¶ 25. Having gained the sense that preservation of the tracts would "generate significant wetland mitigation credits, suitable for use in a wetland mitigation bank," the Walther family proceeded to draft a mitigation banking instrument. Compl. ¶ 26.

Part of the draft instrument was the mitigation plan and map of the two tracts of land: the Edgerton Bank Parcel, which is comprised of 165.80 acres, and the Seldon Bank Parcel, which measures 105 acres. RSE mapped each parcel, indicating the different habitats and the corresponding capacity for certain ecological functions. This map was used to determine the proposed number of credits. The Corps indicated its agreement with the proposed figures for each parcel: 151.81 wetland mitigation credits for the Edgerton

5

Bank Parcel and 83.73 wetland mitigation credits for the Seldon Bank Parcel. "In reliance on the Corps' determination that the Pioneer Reserve Bank would be authorized to sell 151.81 wetland mitigation credits by virtue of inclusion of the Edgerton Bank Parcel, the Walther family conveyed the [l]and to Pioneer." Compl. ¶ 31.

Representatives of the Corps and Pioneer signed the mitigation banking instrument. The document provides that it "is an agreement made and entered into by Pioneer Reserve, LLC (Sponsor) and the U.S. Army Corps of Engineers, Alaska District (Corps)," that becomes "effective upon the latter date of signature by the Sponsor and the Corps." Compl. Ex. B, at 1-2. Specifically, the instrument characterizes itself as "[t]he legally binding and enforceable agreement between the District Engineer of the Corps, and a mitigation Bank Sponsor that formally establishes the mitigation Bank and stipulates the terms and conditions of its construction, operation, use and long-term management." *Id*. at 12. In addition, the instrument states that "[c]ertification of 83.73 credits in the Seldon Bank Parcel and 151.81 credits in the Edgerton Bank Parcel is established by the execution of this instrument." *Id*. at 10. The instrument also includes Pioneer's obligations for proper physical, legal, and financial maintenance of the wetland bank into the future. Attached to and included by reference in the instrument are the mitigation plan, ecological reports, and the maps used to determine the number of credits. *See id*. at 21, 57, 63.

Once the mitigation banking instrument was signed, Pioneer encumbered both parcels of land with a perpetual conservation and preservation easement as required in the agreement. Thereafter, Pioneer was able to sell some its Edgerton Bank Parcel credits to the Alaska Department of Transportation for $79,000 per credit. No further sales took place, however, because, although the Alaska Railroad Corporation was seeking credits to compensate for the unavoidable impacts caused by its railroad extension, the Corps unilaterally reduced the number of wetland mitigation credits available from the Edgerton Bank Parcel from 151.81 to 16.92. The Alaska Railroad Corporation purchased the remaining 16.92 credits attributable to the Edgerton Bank Parcel and then had to secure the remaining credits from another bank located in a different service area. According to plaintiff, its inability to sell the full complement of credits cost resulted in a loss of $12 million.

Pioneer filed its complaint here on May 5, 2014. It asserts that the Corps materially breached the contract when it unilaterally and without cause

drastically reduced the number of credits available for sale from the Edgerton Bank Parcel. Defendant has moved to dismiss on the ground that plaintiff's complaint does not allege a cause of action within this court's jurisdiction because the mitigation banking instrument is not a contract. We conclude, for the reasons explained below, that the complaint alleges sufficient facts to support its assertion that the mitigation banking instrument was, in fact, a contract. We thus deny the motion.

## DISCUSSION

The Court of Federal Claims possesses only that jurisdiction authorized by statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 373 (1994). The relevant provision here is the Tucker Act, which grants us jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2012). Plaintiff must establish by a preponderance of the evidence that its claim falls within the subject matter jurisdiction of this court before we may consider the merits of the claim. *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).

Pioneer asserts that we have jurisdiction pursuant to the Tucker Act because there is an express contract between plaintiff and the United States government. To prove the existence of a contract, "[o]ne must show (1) mutuality of intent to contract; (2) consideration; and (3) lack of ambiguity in offer and acceptance." *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003) (citing *Lewis v. United States*, 70 F.3d 597, 600 (Fed. Cir. 1995)). Additionally, when the federal government is party to the contract, "the government representative whose conduct is relied upon must have actual authority to bind the government in contract." *Id.* While defendant does not dispute that plaintiff dealt with a government agent that had authority to enter into a binding agreement, it does contest the existence of the other elements of a contract. Specifically, defendant alleges that Pioneer cannot establish the requisite intent to contract because the agency gave its approval to the instrument as an exercise of its regulatory function rather than in its role as a party exchanging a promise. Defendant points to the regulations set forth at 33 C.F.R. Part 332, and argues the following:

> [T]he regulations specifically frame the mitigation bank instrument as "provid[ing] the authorization for the mitigation bank . . . to provide credits to be used as compensatory mitigation for [Corps] permits." 33 C.F.R. § 332.8(a)(1). The regulations also state that "[a]ll mitigation banks must have an approved instrument signed by the sponsor and the district engineer prior to being used to provide compensatory mitigation for DA permits." 33 C.F.R. § 332.8(a)(1). Such approval is a regulatory function, and not a contractual relationship.

Def.'s Mot. to Dismiss 10.[5] According to defendant, "the Corps does not execute mitigation bank instruments to accomplish wetlands restoration, but rather to document that the Corps has evaluated and approved the mitigation banker's plan." Id. at 11 (quotations omitted). Thus, defendant argues that the Corps has nothing to exchange in consideration for its approval of the mitigation banking instrument. According to defendant, the absence of consideration and mutual intent to contract show that plaintiff did not have a contract with the government[6] and, therefore, plaintiff's complaint should be dismissed for lack of subject matter jurisdiction.

To support its argument, defendant points to *D & N Bank v. United States*, 331 F.3d 1374 (Fed. Cir. 2003). In that case, D & N Bank ("D & N") sought to recover damages for breach of contract which occurred when, because of new federal legislation, D & N was not able to use the goodwill value of the thrift that it recently acquired with the approval of the Federal Home Loan Bank Board. Id. at 1376-77. D & N argued that its ability to use

---

[5] The regulation quoted by defendant provides, in full, that "All mitigation banks and in-lieu fee programs must have an approved instrument signed by the sponsor and the district engineer prior to being used to provide compensatory mitigation for DA permits." 33 C.F.R. § 332.8(a)(1) (General Considerations). In another section, the regulation defines mitigation banking instrument as "the legal document for the establishment, operation, and use of a mitigation bank." Id. § 332.2 (Definitions).

[6] We note that the government's position in this case should be contrasted with its stance in *United States v. Hawkins*, No. 3:05CV-12-H (W.D. Ky. March 31, 2006), where the government sought to enforce the terms of a mitigation banking instrument by arguing that the instrument was a contract.

the goodwill value gained in the merger was a term of the contract it had with the Federal Home Loan Bank Board regarding the acquisition.  *Id*.  The problem in that case, however, was that D & N did not provide sufficient evidence that a contract existed between it and the Federal Home Loan Bank Board.  The Court of Appeals for the Federal Circuit described the evidence as follows:

> [N]one of these documents purports to be a contract between D & N and the government or indicates that it binds parties on either side of the transaction. . . . [T]he only piece of paper that can be viewed as indicating a promise by someone with any authority is the Bank Board Resolution.  This document, however, only shows the [Federal Home Loan] Bank Board's approval of the merger.  Mere approval of the merger does not amount to intent to contract.  The Bank Board, in its regulatory capacity, must approve all mergers.

*Id*. at 1378.  The Court of Appeals went on to note that there was no evidence of negotiation, no evidence of mutual intent to contract, especially in the absence of a written agreement purporting to set forth the agreement of the parties, and no discussion of goodwill, let alone D & N's right to use the value of goodwill, in the documents presented to the court by D & N.  *Id*. at 1378-79.  In the absence of the aforementioned, the Federal Circuit concluded that the Federal Home Loan Bank Board's approval of the merger was a function of its regulatory or sovereign duty rather than evidence of its intent to contract with D & N.  *Id.* at 1380, 1382; *see also Anderson v. United States*, 344 F.3d 1343, 1355-57 (Fed. Cir. 2003) (holding that the agency had not expressed the requisite intent to be bound and instead imposed a regulatory condition when it included in the resolution a provision requesting the bank to submit and justify the value of the goodwill and the proposed amortization schedule at a later date).

We find defendant's reliance on *D & N* to be misplaced.  Unlike the situation in *D & N*, there is a document in this case which provides that it is "[t]he legally binding and enforceable agreement between the District Engineer of the Corps, and a mitigation Bank Sponsor that formally establishes the mitigation Bank and stipulates the terms and conditions of its construction, operation, use and long-term management." Compl. Ex. B, at 12.  The agreement states that "[c]ertification of 83.73 credits in the Seldon Bank Parcel and 151.81 credits in the Edgerton Bank Parcel is established by the execution

9

of this instrument." Compl. Ex. B, at 10.  Furthermore, the agreement records a promise "whereby Pioneer agrees to acquire and preserve 235.54 acres of threatened resources which benefits the Corps in its efforts to maintain the ecological health of the region and to carry out its duties to protect the quality of the area's waters under the Clean Water Act."  Pl.'s Resp. 3-4 (citations omitted).  In exchange for plaintiff's promise "to preserve the [l]and, the Corps agreed to award Pioneer 'Bank credits' which it can sell to third parties."  *Id*.  Additionally, plaintiff alleges and defendant does not dispute that these terms were agreed to after a series of meetings, site visits, and the production of ecological reports.  The complaint thus alleges negotiation, mutual intent to contract, bargained for exchange of consideration, and a memorialized final instrument setting forth the terms of the bargain.

Plaintiff argues that this case is analogous to *Davis Wetlands Bank, LLC v. United States*, which was recently decided by this court, and which also involved environmental mitigation banking.  114 Fed. Cl. 113 (2013).  In *Davis Wetlands Bank*, the court was presented with defendant's theory that Davis' signed final mitigation banking instrument was merely a regulatory action, not a contract.  The court examined the instrument and supporting documents "'to see if they consist of only regulatory proclamations, or if they include additional language, which clearly manifests the government's intent to contract.'"  *Id*. at 122 (quoting *First Fed. Lincoln Bank v. United States*, 60 Fed. Cl. 501, 504 (2004)).  After reviewing the relevant documents, the court held the following:

> [T]he Final Agreement contains definite terms and recites the obligations contained and acceptance manifested by the signatures from a Bank representative, a District Engineer for the Army Corps, and a representative from [the United States Fish and Wildlife Service].  The documents and exhibits that together comprise the Final Agreement were reviewed and signed by the parties over the course of several years, suggesting a negotiated arms-length process.  This ongoing process . . . represents the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.
>
> As consideration for the Bank's promise to restore wetlands subject to the Final Agreement, the Army Corps promised to issue the bank credits . . . .

10

>       Therefore, under the Final Agreement, the Army Corps agreed to enter into a contract with private parties to accomplish wetland restoration in exchange for issuing credits that could be sold to third parties . . . .

*Id.* at 121-22 (quotations and citations omitted). The court concluded that "[t]he fact that 'no landowner can develop a mitigation bank absent [Army] Corps approval,' does not preclude the Army Corps from contracting with a private party." *Id*. at 122 (quoting *Hearts Bluff Game Ranch v. United States*, 669 F.3d 1326, 1331 (Fed. Cir. 2012)).

We agree with the analysis in *Davis Wetlands Bank*. The instrument presented by Pioneer purports to be the a legally binding agreement between plaintiff and the Army Corps, which lays out the obligations that each party assumes by entering into the agreement. Pioneer agreed to preserve in perpetuity two parcels of valuable land in exchange for the ability to sell "credits" to third parties who have "debits" owing to development projects that unavoidably impact waterways. The Corps, by agreeing to this arrangement, carries out a purpose of the agency, which is to restore and preserve the United States waterways pursuant to the Clean Waters Act. While this arrangement is made against a regulatory background, that background is not incompatible with the development of a binding agreement. The regulations merely describe the ground rules pursuant to which the Corps may accept, reject, or respond to an offer. In turn, if a counter-offer is made, the sponsor is not obligated to accept it, but may respond with acceptance, a rejection, or another counter-offer. In this case, the process ended in the memorialization of a mitigation banking instrument that establishes the parties' respective roles, benefits, and obligations concerning the mitigation bank. In the absence of any factual challenge to the elements of the contract asserted by Pioneer, we hold that the complaint alleges sufficient facts to establish the existence of a contract.

Defendant makes a second challenge to our jurisdiction, namely that plaintiff has not identified a right to recover money damages. A money-mandating source is necessary because "jurisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act." *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004). Defendant contends that "[n]ot even a liberal reading" of the instrument "creates any inference that the Government obligated public money to this instrument." Def.'s Mot. to Dismiss 13. Plaintiff responds that the standard is whether there is a fair inference that the

11

contract is "reasonably amenable to the reading that it mandates a right of recovery in damages." *Holmes v. United States*, 657 F.3d 1303, 1309 (Fed. Cir. 2011). Additionally, plaintiff cites *Holmes*, for the proposition that "when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required." *Id*. at 1314. Defendant has offered us no plausible reading of the agreement under which the parties disavow the possibility of money damages if plaintiff prevails on the merits. Plaintiff has presented a contract that can be fairly interpreted as mandating money damages as a remedy and thus brings a claim for breach within our jurisdiction.

## CONCLUSION

We deny the motion to dismiss. Defendant is directed to answer the complaint on or before December 19, 2014.

 s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge