# In the United States Court of Federal Claims

No. 14-376C
(Filed: February 16, 2016)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PIONEER RESERVE, LLC,

          *Plaintiff*,

v.

THE UNITED STATES,

          *Defendant*,

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Clean Water Act; mitigation bank; contract interpretation; incorporation of contract terms; breach of contract; 33 C.F.R. § 332.3

*Douglas E. Kahle*, Virginia Beach, VA, for plaintiff.

*Geoffrey Martin Long*, Civil Division, Department of Justice, Washington, D.C., with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge.*

Pioneer Reserve, LLC ("Pioneer" or "plaintiff") brings this breach of contract case against the United States Government ("defendant") pursuant to the Tucker Act, 28 U.S.C. § 1491. Plaintiff, the sponsor of the Pioneer Reserve Wetland Mitigation Bank, claims that the Umbrella Mitigation Banking Instrument ("UMBI") entered into between Pioneer and the United States Army Corps of Engineers, Alaska District ("Corps"), was an enforceable contract between the parties, which the Corps breached. The government previously moved to dismiss on the grounds that the UMBI was not a contract. We rejected that argument. *See Pioneer Reserve, LLC v. United States*, 119 Fed. Cl. 201 (2014). Pending are the parties' motions for summary judgment. The matter is fully briefed, and oral argument was held on January 6, 2016.

For the reasons stated below, we deny plaintiff's motion for summary judgment, and we grant in part and deny in part defendant's motion for summary judgment.

BACKGROUND

The facts and statutory background of this case have been set out at length in our previous opinion, in which we denied defendant's motion to dismiss plaintiff's complaint. *Id.* We will therefore provide an abridged statement of the facts related to the pending motions.

**The UMBI**

The UMBI, signed September 9, 2011, "describes the establishment, use, operation, maintenance and long-term management of the Pioneer Reserve Wetland Mitigation Bank." Def.'s App. 8. It provides that it "is an agreement made and entered into by Pioneer Reserve, LLC (Sponsor) and the U.S. Army Corps of Engineers, Alaska District (Corps)." *Id.* The instrument establishes two parcels that comprise the Bank: the Seldon Bank Parcel and the Edgerton Bank Parcel. *Id.* It indicates that the Edgerton Parcel, the parcel at issue here, contained 165.8 acres, 134.6 of which were wetlands and 31.2 of which were uplands.

The instrument certifies 83.73 credits in the Seldon Bank Parcel and 151.81 credits in the Edgerton Bank Parcel. *Id.* at 17. There are several types of credits: palustrine, riparian, and marine.[1] These credits can be purchased by third parties in order to offset environmental impacts to the same or similar type of habitat. Of Pioneer's 151.81 Edgerton Parcel credits, 124.7 were palustrine. *Id*. The instrument classified the rest of the parcel as uplands, riparian credits, or "buffer zones," which are zones that lie in between other classifications.

The instrument characterizes itself as a "legally binding and enforceable agreement between the District Engineer of the Corps, and a mitigation bank sponsor that formally establishes the mitigation Bank and stipulates the terms and conditions of its construction, operation, use and long-term management."

---

[1] Palustrine is a wetland system that consists of soggy highly-vegetated non-tidal areas such as marshes, bogs, swamps, bottomland forests, and small ponds. Marine wetlands are saltwater coastal wetlands. Riparian wetlands are those situated between land and a river or stream.

*Id.* at 12. It further states that the instrument "may only be amended or modified with the written approval of the Sponsor and Corps." *Id.* at 15.

The UMBI was amended in November 2013. *Id.* at 586. The effect of the amendment was to change the characterization of certain portions of Pioneer's Edgerton Parcel from wetlands to uplands. *Id.* at 546, 586. Plaintiff contends that the net result was to eliminate all but 16.92 palustrine credits with respect to the Edgerton Parcel. Defendant, however, maintains that the amendment resulted in nothing more than a change in mapping and classification.

The parties disagree about how the amendment came about and whether the change was bilateral. Defendant contends that plaintiff agreed to the change, but plaintiff denies that. There is no question that the amendment followed numerous discussions between Calliandra Donn, Pioneer's Principal, and the Corps. In September 2012, Nicole Hayes, a representative of the Corps, emailed Donn the map revision that the Corps was considering. Pl.'s App. 71. Hayes had visited the property, which apparently caused her to be concerned that areas mapped as wetlands were actually uplands.

Donn initially responded favorably, apparently under the impression that the proposed revisions would actually give Pioneer more of a preferable type of credit. Def.'s App. 237 (Excepts of deposition testimony of Calliandra Donn). She subsequently sent Hayes a revised table A-6, showing credit calculations for Pioneer's Edgerton Parcel, which she had updated to reflect the Corps' map revisions. Pl.'s App. 73. Hayes emailed Donn again in October 2012, informing Donn that the Corps was still waiting on internal review. *Id.* at 83. In May 2013, the Corps sent another letter to Donn. This letter mentioned the proposed changes to Pioneer's mitigation bank as well as Pioneer's concerns regarding these changes. *Id.* at 84-85. Although the record presents no earlier reference to Pioneer declining to modify the UMBI, the May 2013 letter further requested that Pioneer reconsider declining the opportunity to modify the UMBI. *Id.* at 85. The Corps warned that "without a modification to the [UMBI], the Corps intends to suspend credit sales for the incorrectly designated portions of this parcel in accordance with Section VII. N. of the Umbrella MBI." *Id.*

Following the events detailed above, the Corps issued the amended UMBI in November 2013. Def.'s App. 586. Whether plaintiff signed off on this change is an issue which we discuss in detail later.

3

### The Alaska Railroad Corporation's § 404 Permit

When it created the mitigation bank, plaintiff was aware that the Alaska Railroad Corporation ("ARRC") planned to construct a railroad extension that would impact wetlands and other water resources, triggering a need for mitigation credits. This railroad extension, called the Port MacKenzie Rail Extension Project ("PMRE") would be located within the service area of Pioneer's mitigation bank, thus satisfying the requirement that compensatory mitigation "be located within the same watershed as the impact site . . . ." 33 C.F.R. § 332.3(b)(1) (2015).

Indeed, ARRC was issued a Department of the Army ("DA") permit pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344, on September 10, 2012, authorizing "the discharge of 1,618,587 cubic yards of fill material into 95.8 acres of waters of the U.S., including wetlands, as part of the construction of a 35.8-mile rail line . . . ." Def.'s App. 386. The permit was conditioned on ARRC purchasing a total of 160.2 wetlands credits. *Id.* at 389. It directed that 16.92 palustrine credits be purchased from Pioneer, and 143.38 palustrine credits be purchased from the Su-Knik Mitigation Bank ("Su-Knik"). *Id.* According to the deposition of Lieutenant Colonel Mark DeRocchi, a member of the Corps, the Corps directed ARRC to buy most of its credits from Su-Knik because the Corps was under the impression that Pioneer had only 16.92 credits to sell. Pl.'s App. 39. Benjamin Soseith, a member of the Corps and project manager for the PMRE permit, stated in his deposition that Pioneer had only 16.92 credits to sell which were of the type appropriate to mitigate the PMRE's impacts. *Id.* at 30.

The permit is accompanied by a record of decision ("ROD"), which contains a section explaining the preference for compensatory mitigation for the PMRE project. Def.'s App. 495. This section explains that similar habitat credits of Pioneer's Edgerton parcel are the ecologically preferred source of compensatory mitigation, and notes that this parcel "contains some credits of the same habitat type that support the Little Susitna Watershed (33 C.F.R. § 332.3(a)-(c)) where the PMRE is located." *Id.* It listed as the second most ecologically preferred source of compensatory mitigation similar habitat credits of Su-Knik's Big South Lake parcel. *Id.*

After its permit was issued, ARRC entered into negotiations with Pioneer in an attempt to reach agreement on a price for the 16.92 Edgerton

4

palustrine credits. *Id.* at 561. Pioneer asked for approximately $146,800 per credit for the 16.92 credits, for a total of $2.496 million. *Id.* at 241. ARRC, on the other hand, offered a much lower price of $346,000 total. *Id.* Unable to reach agreement with Pioneer at what ARRC viewed to be a reasonable price, ARRC submitted a request to the Corps for modification of its DA permit. *Id.* at 560. In its request, ARRC explained that purchasing credits from Pioneer was cost prohibitive. *Id.* at 561. It proposed three alternatives: (1) allow ARRC to purchase its 160.2 credits from either Pioneer or Su-Knik; (2) allow ARRC to use an in-lieu fee provider as an alternative to a mitigation bank; or (3) allow ARRC to purchase the 16.92 credits it was directed to purchase from Pioneer from either Pioneer or Su-Knik through a competitive bidding process. *Id.* ARRC later withdrew its initial request and submitted a new one, limited to a request that it be permitted to purchase the 16.92 credits from Great Land Trust instead of Pioneer. *Id.* at 573. The Corps approved the latter request on January 28, 2013. *Id.* at 577. ARRC then went ahead with its purchases from entities other than Pioneer.

Plaintiff filed suit on May 5, 2014, asserting that the amendment to the UMBI and the Corps' failure to adhere to applicable regulations constituted a breach of contract. We denied defendant's motion to dismiss on November 21, 2014. The parties' cross-motions for summary judgment were subsequently filed on October 21, 2015.

## DISCUSSION

In its current motion, plaintiff argues that the Corps breached the contract in two ways: by unilaterally reducing the number of credits available for sale in Pioneer's Edgerton Bank Parcel and by failing to make use of Pioneer's mitigation bank credits in accordance with 33 C.F.R. § 332 ("the Final Rule"), which plaintiff alleges was incorporated into the UMBI. As a result of the breach, plaintiff contends that it suffered direct damages in the form of lost profits of $12,655,800.

Regarding the unilateral reduction of credits, plaintiff argues that it never consented to the modification of the UMBI. Therefore, the Corps' reduction of plaintiffs' available palustrine credits constituted a breach. According to plaintiff, had the number of credits not been reduced, ARRC would have purchased them.

Plaintiff's argument with respect to the Final Rule is that it was

incorporated into the UMBI and that the Corps violated the regulations by directing ARRC to purchase credits from an out-of-service mitigation bank when Pioneer had credits available. Plaintiff also contends that, because Pioneer's bank credits were the highest-rated source of compensatory mitigation, the regulations required the Corps to direct ARRC to purchase them. Thus, by failing to adhere to the regulations, plaintiff argues, the Corps breached the UMBI.

Defendant begins by repeating an argument we rejected earlier, namely, that it did not assume any contractual duty by entering into the UMBI. Recognizing that the law of the case for now is that the UMBI is a contract, it goes on to make other arguments. It first argues that a unilateral reduction of credits never occurred. Instead, it contends that the revision of UMBI Table A-6 to reflect a different number of palustrine credits was agreed to by Calliandra Donn, Pioneer's principal. I.e., the amendment to the UMBI was bilateral.

Defendant also makes a number of counter-arguments with respect to plaintiff's contention that the Corps' regulatory actions with respect to ARRC's permit process constituted a breach of the UMBI. Defendant begins by challenging the assertion that the Final Rule was incorporated into the UMBI, but goes on to argue that even if it was, the incorporation was not specific enough to convert the regulatory obligations with respect to ARRC into contract terms with plaintiff. In defendant's view, the Corps' ability to determine appropriate compensatory mitigation for a DA permit, particularly for a third party, is separate and distinct from the UMBI and, equally important, the Corps is clothed with substantial discretion on the regulatory side which precludes any concerns plaintiff might raise in enforcing the UMBI.

Defendant further argues that, as a result of the decision of the United States District Court for the District of Alaska in *Walther v. United States*, 2015 WL 6872437 (D. Alaska Nov. 9, 2015), collateral estoppel precludes plaintiff from proving causation in connection with its breach claim. In that case, plaintiff challenged the validity of Su-Knik's banking credits, arguing that it suffered economic injury as a result of the Corps' failure to adhere to the applicable regulations. Defendant argues here that the District Court's decision in *Walther*–that the permittees were unlikely to have purchased Pioneer's credits even if they had been available and that the Corps did not violate the terms of the UMBI during its determination of appropriate compensatory

mitigation for the PMRE permit–forestalls plaintiff's causation argument in the current case.

This court will only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rules of the Court of Federal Claims ("RCFC") 56(a). We therefore will examine the facts to determine whether a genuine dispute exists regarding any element of Pioneer's claim.

### Whether the UMBI Was Breached

A threshold question concerns the terms of the contract. Specifically, did Pioneer agree to the amendment, and was the Final Rule incorporated as part of the contract? If Pioneer did not agree to the amendment, then because of the instrument's requirement that it "only be amended or modified with the written approval of the Sponsor and Corps," the Corps breached the contract by unilaterally amending it. If the Final Rule was incorporated into the UMBI, then the Corps breached the agreement only if it did not adhere to the Final Rule in its decision-making related to the PMRE permit.

### A. UMBI Modification

Thus, we must first decide whether Pioneer breached the UMBI through a unilateral modification to the number of credits Pioneer had available to sell from its Edgerton Parcel. This is answered in part by the fact that the UMBI clearly states that it "may only be amended or modified with the written approval of [Pioneer] and the Corps." Def.'s App. 22. The UMBI was in fact amended in November 2013. *Id.* at 586. Therefore we must determine whether both Pioneer and the Corps consented to this modification. We will only grant summary judgment if there is no genuine dispute of material fact regarding whether both parties consented to the modification.

The original UMBI provided Pioneer with a total of 151.81 credits in its Edgerton Parcel. *Id.* at 52. Of these 151.81 credits, 124.7 were palustrine. *Id.* After the modification took place, the Edgerton Parcel was left with a total of 151.6 credits, 36.36 of which were palustrine. *Id.* at 588. During 2012 and 2013, there were numerous communications between Calliandra Donn and the Corps regarding the modification to the UMBI. Pl.'s App. 71-85. At one point during these communications, Donn provided the Corps with an updated table

A-6, reflecting the new proposed credit numbers in Pioneer's Edgerton Parcel.[2] Def.'s App. 247. Donn, however, contends that at this point in time, she was unaware of the impact of the changes to the UMBI. *Id.* at 237 (Excerpts of deposition testimony of Calliandra Donn). Subsequent to this event, the Corps sent Donn a letter mentioning Pioneer's disagreement with the proposed modifications. *Id.* According to Donn's later declaration, the Corps had informed her that it was only considering a technical mapping change, and Pioneer was unaware that any proposed changes would have an effect on the number, type, or value of Pioneer's credits. *Id.* at 121.

Based on the facts provided, there is no clear proof that Pioneer consented to the modification of the UMBI. As a result, there are fact issues that preclude summary judgment for defendant on the basis of consent to the modification.

B. Final Rule Incorporation

To the extent that plaintiff argues that the Final Rule was incorporated into the UMBI and thus that the UMBI was breached through the Corps' decision to direct ARRC to buy only 16.92 credits from Pioneer and the rest from Su-Knik, we disagree. To incorporate extrinsic material by reference, a contract

> must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history).

*Northrop Grumman Inform. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008). The UMBI, under the heading "II. AUTHORITIES" provides that "[t]he establishment, use, operation, and maintenance of the bank will be carried out in accordance with . . . [the Final Rule] . . . ." Def.'s App. 9. This statement does not explicitly indicate that the parties intended to incorporate the Final Rule as an enforceable term of the contract. A contract must always be

---

[2] However, the revised Table A-6 sent by Donn to Hayes is not the same as the revised Table A-6 actually adopted in the modifications to the UMBI. *Compare* Def.'s App. 247 *with* Def.'s App. 588.

carried out in accordance with applicable law; this reference does no more than point out the Final Rule as relevant background law.

Notwithstanding whether the Final Rule was incorporated into the UMBI, we agree with defendant's argument that the regulations afford the Corps some level of discretion, which insulates its PMRE permit decision from collateral scrutiny in an action here for damages. The Corps has discretion in determining appropriate compensatory mitigation methods associated with a specific DA permit.[3] *See* 33 C.F.R. § 332.3. Thus, the regulations allowed the government discretion to determine which type of compensatory mitigation was most appropriate for the PMRE project, meaning that the Corps was not contractually bound to a third party (Pioneer) to require ARRC to buy Pioneer's credits. The UMBI does not supersede this discretion, as it states that it "does not in any manner affect statutory authorities and/or responsibilities of the signatory parties." Def.'s App. 9. Defendant is thus entitled to partial summary judgment as to the incorporation issue.

### If the UMBI was Breached, Whether it Caused Plaintiff's Damages

Plaintiff assumes that, but for the breach, ARRC would have purchased all of its credits for its PMRE impacts from Pioneer at a price of $79,000 per credit. Plaintiff bases its credit price upon two prior sales of its mitigation bank credits to the Alaska Department of Transportation, one in July 2013 and one in January 2014. Both sales involved a price of $79,000 per credit.

---

[3] While plaintiff is correct that the regulations do mandate certain considerations to be made when selecting appropriate compensatory mitigation, plaintiff fails to recognize that several subsections of the regulations also operate to give the Corps discretion notwithstanding the required considerations. For example, plaintiff points to the regulations' requirement that mitigation be "in-kind," meaning that it is of the a similar type as the impacted resource. Br. in Supp. of Pl.'s Mot. for Summ. J. 20. However, there is no such requirement; the regulations merely provide that in-kind mitigation is *preferable* to out-of-kind mitigation. 33 C.F.R. § 332.3(e)(1). Plaintiff further refers to 33 C.F.R. § 332.3(b), which provides that when considering mitigation options, the Corps must give preference to requiring use of a mitigation bank's credits as mitigation if the environmental impacts are located within the bank's service area. *See id.* § 332.3(b)(1). Again, this is merely a preference rather than a requirement.

Defendant responds that this is, at best, speculative, because ARRC had other compensatory mitigation options aside from Pioneer's Edgerton Parcel credits which it could have utilized to mitigate the PMRE impacts. It points out two sales that plaintiff ignores–Su Knik's sale of 143.28 credits to ARRC at $10,000 per credit and GLT's sale of 16.92 credits to ARRC at $29,084 per credit.

In support of the motions on this issue, we have the following facts: The PMRE permit was issued on September 10, 2012, directing ARRC to buy 16.92 credits from Pioneer's Edgerton Parcel and its remaining credits from Su-Knik. Def.'s App. 389. According to Lieutenant Colonel Mark DeRocchi, a member of the Corps, the Corps directed ARRC to buy most of its credits from Su-Knik because Pioneer had only 16.92 credits to sell. Pl.'s App. 39. Benjamin Soseith, another member of the Corps who served as project manager for the PMRE permit,  stated that Pioneer had only 16.92 credits to sell that were of the type appropriate to mitigate the PMRE's impacts. *Id.* at 30. The ROD for ARRC's permit included an evaluation of the most ecologically preferred options for compensatory mitigation, which found that Pioneer's Edgerton Parcel was the most preferred option, followed by Su-Knik's Big South Lake Parcel. Def.'s App. 495. We also know that, on November 9, 2012, ARRC requested a modification to its permit, citing in part the fact that it viewed purchasing 16.92 of Pioneer's credits at approximately $146,800 per credit as cost prohibitive. *Id.* at 560-65.

Leading up to the issuance of the PMRE permit were discussions between Hayes and Pioneer, as well as between Hayes and the bank's interagency review team ("IRT"), which is the entity involved in creating the UMBI, regarding a possible reclassification of some areas of Pioneer's Edgerton Parcel. These discussions were triggered by Hayes' visit to the Edgerton Parcel in May 2012, during which she discovered that areas mapped as wetlands were actually uplands. *Id.* at 544. Hayes expressed these concerns to the IRT via email in July 2012. *Id.* at 549. On September 7, 2012,  Hayes sent an email to Donn notifying her of the UMBI revision that the Corps was considering, which reclassified portions of the Edgerton Parcel. *Id.* at 552. Even if this arguably breached the UMBI, what it nevertheless exposes is the possibility that the Corps would not have been bound, in its permitting capacity, to consider 124.7 of the Edgerton credits as "like" palustrine credits appropriate to mitigate the impacts of the PMRE.

In short, even if we found that there was a breach, fact issues are

present. For plaintiff to prevail and show that the alleged breach did in fact cause Pioneer's damages, it would need to provide more information regarding other available compensatory mitigation options for the PMRE project and facts indicating that Pioneer's credits were the most likely option–notably, a showing that the improper classification of the Edgerton Parcel's uplands areas as wetlands did not render Pioneer's credits unsuitable to mitigate the impacts of the PMRE. Additionally, this court would require evidence that the ADOT impacts are similar to the PMRE impacts such that they warrant similar credit types and prices. Defendant, on the other hand, has failed to present evidence showing that as a matter of law, plaintiff cannot prove damages.

## CONCLUSION

For the foregoing reasons, we deny plaintiff's motion for summary judgment, and we grant in part and deny in part defendant's motion for summary judgment. The parties are directed to confer and propose by March 8, 2016, jointly if possible, a schedule leading to trial in October 2016.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge