# In the United States Court of Federal Claims

No. 14-376C

(Filed: September 26, 2016)

* * * * * * * * * * * * * * * * *

PIONEER RESERVE, LLC,

          *Plaintiff*,

v.

THE UNITED STATES,

          *Defendant*.

Contracts; Environmental Mitigation Banking.

* * * * * * * * * * * * * * * * *

*Douglas E. Kahle*, Virginia Beach, VA, for plaintiff.

*Geoffrey Martin Long,* Civil Division, Department of Justice, Washington, DC, with whom were *Anthony Schiavetti* and *Jeff Lowry*, Civil Division, Department of Justice, Washington, DC.

## OPINION AND ORDER

    This case illustrates the confusion and unfairness which can inadvertently result from an agency acting simultaneously in both a contractual and regulatory capacity. The agency here is the United States Army Corps of Engineers operating through the Alaska Division ("the agency" or "the Corps"). By statute, the Corps is given responsibility to regulate the discharge of pollutants into waters of the United States. *See* 33 U.S.C. § 1344 (2016). In order to assist it in achieving that end, it has erected an extensive regulatory scaffold, including provisions which allow it to issue "credits" to landowners who agree to preserve the environmental integrity of their lands. 33 C.F.R. § 332.8 (2016). Those credits can then be sold to unrelated entities that use them as offsets against pollutant discharge in connection with construction or dredging projects. In effect, the Corps uses its monopoly regulatory powers to create a market of assets which otherwise would not exist.

    Plaintiff Pioneer Reserve, LLC ("Pioneer" or "plaintiff") is a land-owning entity which entered into an Umbrella Mitigation Banking Instrument

("UMBI") with the Corps by which plaintiff voluntarily imposed permanent environmental protection easements on two parcels of its land in exchange for the right to market the resulting credits. Plaintiff alleges in this Tucker Act proceeding[1] that the Corps, acting in its regulatory capacity, breached that contract by unilaterally reducing the total number of wetland mitigation credits that plaintiff had available to sell and by changing the official classification of those credits, thus lowering the desirability of those credits to buyers, and frustrating plaintiff's plans to sell those credits to the Alaska Railroad Corporation ("ARRC").

We previously held in *Pioneer I*[2] that the UMBI amounted to an enforceable contract. In *Pioneer II*,[3] we denied plaintiff's motion for summary judgment and granted-in-part and denied-in-part defendant's motion for summary judgment. We found that there were factual issues regarding whether Pioneer consented to the modification of the UMBI and with respect to damages. Trial was therefore necessary.

Trial was held in Anchorage, Alaska from June 20-25, 2016. The court heard live testimony from numerous witnesses, including Pioneer owners and managers Scott Walther and Calliandra Donn, various Corps employees, the project manager for ARRC, and damages experts Charles Thompson (for plaintiff), and Dr. Benjamin Guillon (for defendant). After post trial argument, the matter is now ripe for disposition.

For the reasons set forth below, the court holds that defendant unilaterally modified the terms of the contract, thereby causing a breach. However, because plaintiff was unable to prove that it would have sold its credits in the non-breach world, it has not demonstrated that it is entitled to any damages as a result of the breach.

BACKGROUND

*A. Factual Background*

An environmental mitigation bank is created when the owner of a parcel of land places a permanent encumbrance on the land. This encumbrance

---

[1] 28 U.S.C. § 1491 (2012).

[2] *Pioneer Reserve, LLC v. United States*, 119 Fed. Cl. 201 (2014).

[3] *Pioneer Reserve, LLC v. United States*, 125 Fed. Cl. 112 (2016).

prohibits development and requires the ongoing maintenance and/or restoration of the land to keep it functioning biologically as it originally would without human interference. In exchange, the owner is granted a certain number of credits based upon an assessment of the land. Various credits are awarded based on the type of soil and vegetative characteristics of the parcel.[4] The mitigation bank can then sell these credits to entities which need to offset environmental damage to the waters of the United States caused by development projects. The dynamics of credit generation and sale has created a lively market of buyers and sellers, although this phenomenon was just getting started in southeast Alaska at the time this conflict unfolded.

The Corps attempts to match as closely as possible the land being affected by the development project to the land encumbered by the environmental easements. In this regard, it considers two factors: the characteristics of the land and its physical proximity to the impacted area, referred to as a bank's "service area." Based on these factors, the Corps identifies a mitigation bank or other entity whose credits, in its discretionary opinion, provide the best match to offset the expected environmental impact of the project. The Corps keeps track of the type and amount of mitigation credits that mitigation banks and in-lieu fee providers have available using an online database known as RIBITS, an acronym derived from the Regulatory In Lieu Fee and Bank Information Tracking System. The Corps then plays match-maker and points the applicant for a development permit to particular sources from which the permitee is directed to buy credits. The Corps does not specify a price for the credits, leaving that to the parties to negotiate.

Pioneer is a mitigation bank located in the Matanuska-Susitna Borough in Alaska. It is owned and managed by Scott Walther and his daughter, Calliandra Donn. Pioneer consists of two parcels of land, the Edgerton Bank Parcel ("Edgerton") and the Seldon Bank Parcel ("Seldon"). Mr. Walther

---

[4] There are various types of credits, including palustrine, riparian, and riverine. They generally refer to the characteristics of the associated land. For example, palustrine credits refer to wetlands that consist of soggy highly-vegetated non-tidal areas such as marshes, bogs, swamps, bottomland forests, and small ponds. Riverine credits refer to an actual body of water, such as a stream or river. These credits are further broken down based upon the exact type of foliage on the land. The Corps in Alaska classifies wetlands according to the Cowardin classification system, but the Corps in other jurisdictions may use other classification systems.

acquired both parcels in 1998 and, after considering several options for development, decided that the land would be most valuable if it were preserved as a mitigation bank. In a lengthy process detailed in *Pioneer I*, plaintiff hired an environmental consulting firm, Restoration and Science Engineering ("RSE"), to help it work with the Corps to draft a map of its land, indicating different habitats and capacity for various ecological functions.

At the end of this process, Pioneer and the Corps entered into the UMBI on September 9, 2011. PX 9 (Pioneer's UMBI). Pioneer was assigned 151.81 wetland mitigation credits for Edgerton and 83.73 wetland mitigation credits for Seldon.[5] Of the 151.81 credits generated by the Edgerton parcel, 124.7 were classified as palustrine (with those credits being further assigned palustrine subtypes) and the Seldon parcel generated 73.71 palustrine credits. The Edgerton parcel also contained 4.53 riverine credits, 9.02 credits for wetland buffer, and 6.58 credits for outer buffer. At the time Pioneer was established, there was only one other mitigation bank in operation in this area of Alaska, the Su-Knik Mitigation Bank ("Su-Knik"). In establishing its mitigation bank, Pioneer worked closely with Karen Nelson, an employee of the Corps' Alaska Division and chair of the intra-agency review team ("IRT") associated with Pioneer's mitigation bank. Starting in 2008, Ms. Nelson was Pioneer's primary point of contact with the Corps until she was replaced in 2012 by Nicole Hayes.

At the time plaintiff established its mitigation bank, it was aware that ARRC had plans to build a railroad extension to Port MacKenzie, called the Port MacKenzie Rail Extension Project ("PMRE"). The project would require ARRC to purchase a total of 160.2 mitigation credits as an offset to the destruction of wetlands. PX 26 (ARRC's Permit). This construction would occur geographically close to plaintiff's land, which meant the impact of the project would be in plaintiff's primary service area, and plaintiff, from its dealings with Karen Nelson, was under the belief that the railroad would be obligated to buy credits from it once the permit was issued. Although both Pioneer and Su-Knik operate mitigation banks in the Matnuska-Susitna Borough, they do not share the same primary service area. As plaintiff's expert witness testified, Pioneer was the only mitigation bank that had the impacted area as its primary service area.

---

[5] Seldon credits are not at issue. All references to mitigation banking credits and modification of the UMBI hereafter relate to the Edgerton parcel.

As explained by witnesses at trial, both lay and expert, there are three ways that a developer can obtain mitigation credits necessary to offset the environmental impact of a proposed project: mitigation banking (buying credits from banks such as Pioneer), "in-lieu" fee providers (explained below), and mitigation generated by the permitee on its own lands. In the case of mitigation banking, the credit provider places a permanent encumbrance on its land in exchange for a certain amount of credits, which it can then sell. In the case of in-lieu fee providers, the credit provider is given provisional credits that it can market to businesses. Once a transaction is complete, the in-lieu fee provider has the responsibility of securing land and placing a conservation easement on that land. The third type of mitigation, permitee responsible mitigation, involves the permitee itself purchasing land and devising its own conservation plan. Within these three alternatives, the Corps has expressed a hierarchical preference, with mitigation banking considered the most preferable, in-lieu fee providers the second most preferable, and permitee responsible mitigation the least preferable option.

In September of 2012, the Corps issued ARRC a permit to begin construction of the PMRE, conditioned on its obtaining 160.2 palustrine mitigation credits. The permit ranked available credits in terms of ecological and geographic preference. Credits from Pioneer's Edgerton parcel were the most preferred, Su-Knik's credits were the second most preferred, and credits from Pioneer's Seldon parcel were ranked third. PX26 at 40. At the time, at least according to the UMBI, the Edgerton parcel had available 124.7 assigned palustrine credits and the Seldon parcel had 73.71 assigned credits available. The record is unclear with respect to how many of Su-Knik's 1,891.1 originally-assigned palustrine credits it had available at this time. JX 1 at 20-21 (Su-Knik's UMBI).

Despite the fact that the UMBI previously had awarded Pioneer 124.7 palustrine credits with respect to the Edgerton parcel, the permit required ARRC to purchase only 16.92 palustrine credits from that parcel, with the remainder of the credits (approximately 143) to be purchased from the Su-Knik bank. None were to be purchased from Seldon. After trial, it is clear that ARRC was directed to buy only 16.92 credits from Pioneer because, at the time the permit was issued, and unbeknownst to Pioneer, the Alaska District had re-evaluated Pioneer's Edgerton parcel to correct what the Corps perceived to be a mapping error. This requires some background.

In 2012, Nicole Hayes became the Field Office Supervisor for the

5

Alaska District and replaced Karen Nelson as IRT chair for Pioneer's mitigation bank. Upon assuming her new position, one of Ms. Hayes' first actions was to personally tour plaintiff's land. PX 48 (Letter from Karen Kochenbach, Chief, Regulatory Divison for the Corps, Alaska Division, to Ms. Donn). Ms. Hayes testified that, as she walked across Pioneer's Edgerton parcel, she compared what she was seeing to the map of the Edgerton Parcel contained in Pioneer's UMBI and immediately thought that the land had not been correctly characterized in terms of its hydrological and biologic characteristics. *Id.* Before the Corps' issuance of ARRC's permit, Ms. Hayes and Ms. Donn initiated an exchange e-mails regarding reclassifying Pioneer's Edgerton parcel credits according to what Ms. Hayes believed to be the correct classification of the land.

On August 22, 2012, Nicole Hayes and other Corps members, along with individuals from the Environmental Protection Agency, met with Pioneer to discuss the best way of moving forward with the issue of reclassifying the land. No solution was reached at that time. DX 41 (Notes from meeting between Pioneer, Corps, and EPA). On September 7, 2012, Ms. Hayes sent an e-mail to Ms. Donn with an attached map, showing the proposed changes to the Edgerton parcel.[6] DX 44 (Email conversation between Ms. Hayes and Ms. Donn). This reflected a small reduction in overall credits and a reclassification of a large portion of available palustrine credits, resulting in a dramatic reduction to 16.92 palustrine credits. The former palustrine credits were denominated as "riparian buffer." Ms. Donn replied that the map looked "better than [she] thought" and sent Ms. Hayes an updated table of available credits for the Edgerton parcel reflecting the reclassification. DX 44 at 1 At this time, however, no formal request for change was requested or made.

Despite no official change having been made to Pioneer's UMBI when ARRC's permit was issued by the Corps on September 10, 2012, the permit directed ARRC to purchase only 16.92 palustrine credits from Pioneer and 143.28 palustrine credits from Su-Knik. PX 26 at 45. In response to objections Pioneer raised with the Corps, Lieutenant Colonel Mark DeRocchi, deputy commander of the Army Corps of Engineers, Alaska District, testified that when he looked into the matter, he found that when the permit was issued on September 10, 2012, Pioneer's account in RIBITS showed a balance of over

---

[6]Table A-6 shows Pioneer as having 11.57 PFO1/SS1B credits, 5.25 PEM1b/PEM1C credits, and 0.10 PUB3F credits, which represent the totality of palustrine credits available at the Edgerton parcel.

6

160 credits available for sale by Pioneer. Tr. at 554-55. DeRocchi inquired as to why the permit required ARRC to purchase only 16.92 credits from Pioneer. He was told that, although Pioneer's credits had not been officially modified by any paperwork, Nicole Hayes viewed 16.92 credits as what was saleable by Pioneer. *Id.* Ms. Hayes testified that she was concerned that Pioneer's UMBI had misrepresented the amount of wetland mitigation the land was actually capable of providing. *Id.* At 620.

The railroad succeeded in buying 143 palustrine credits from Su-Knik for $10,000 per credit. As to the 16.92 credits ARRC was directed to buy from the Edgerton parcel, Pioneer made an initial offer to ARRC to sell the credits for $2.496 million. This was based on its pre-existing pricing schedule. Pioneer offered a volume discount, reflected in the following table:

**Tiered Pricing Schedule**

|        | Total Credits Purchased | Discount |
|--------|-------------------------|----------|
| Tier 1 | 0 - 5                   | $160,000.00 (base price, no discount) |
| Tier 2 | 6 - 15                  | 10%      |
| Tier 3 | 16 - 25                 | 20%      |
| Tier 4 | 26 - 45                 | 30%      |
| Tier 5 | 46 - 70                 | 40%      |
| Tier 6 | 71 - 100                | 50%      |
| Tier 7 | > 100                   | 60%      |

DX 36 at 1 (Pioneer's pricing schedule). The percentages indicated in Tiers 2 through 6 reflect an increasing discount to the Tier 1 price based on volume. *Id.*[7]

---

[7] For example, if an entity was to purchase 25 credits from Pioneer, they would pay $160,000 per credit for the first 5, $144,000 per credit for the next 10, and $128,000 for the final ten.

ARRC responded with an offer to purchase the credits for $346,000, approximately $20,000 per credit, twice what it paid Su-Knik. Eventually, unable to reach an agreed price with Pioneer, ARRC asked the Corps to modify its permit. ARRC argued that Pioneer's price was prohibitively expensive. It proposed in the alternative that it be allowed either to: (1) purchase all of the credits from plaintiff or from Su-Knik Mitigation bank; (2) purchase its mitigation credits from an in-lieu fee provider as an alternative to a mitigation bank; or (3) purchase the balance of credits from Su-Knik while opening the sale of the 16.92 remaining credits to a competitive bidding process between Pioneer and Su-Knik. DX 55. The Corps denied ARRC's request on December 21, 2012, noting that, "[a]t this time, ARRC's modification request does not provide the Corps sufficient evidence demonstrating compensatory mitigation costs are so prohibitive that it would make the work authorized under the DA permit no longer practicable." DX 58.3.

On January 25, 2013, ARRC again petitioned the Corps for a permit modification. The request noted that "[d]espite protracted negotiations with Pioneer Reserve, ARRC has been unable to execute a mutual agreement for the purchase of 16.92 mitigation credits." DX 80 at 2 (Email from Jeff Schivley of ARRC to Ms. Hayes). ARRC proposed modifying the permit to allow it to purchase the remaining 16.92 credits from Great Land Trust ("GLT"), an in-lieu fee provider. ARRC further noted that it "cannot purchase these credits directly from Pioneer Reserve as specified by the Corps and comply with Procurement Rules" because ARRC "is owned by the State of Alaska and as such, it is required to comply with Procurement Rules that are based upon competitive principles consistent with [Alaska Statute] 36.30 and industry standards." DX 69 at 1 (Letter from ARRC to Ms. Hayes). Subsequently, in a memorandum drafted by Nicole Hayes, the Corps granted ARRC's request and allowed it to purchase 16.92 credits from GLT. DX 85.

On January 28, 2013, ARRC and GLT completed a sale for the remaining 16.92 mitigation credits. JX 11 (Letter from GLT to ARRC). ARRC paid $492,101.28, or $29,084 per credit. *Id.* In the end, Pioneer did not sell any of its available mitigation credits to ARRC. At the time it filed its complaint, Pioneer had completed only two sales of mitigation credits, both to the Alaska Department of Transportation. The first sale, on July 25, 2013, was for 4.4 credits for a total of $347,600 ($79,000 per credit). PX 52 (First Pioneer bill of sale to Alaska DOT). The second sale, on January 21, 2014, was for 0.28 credits for a total of $22,120.00 (also $79,000 per credit).

8

Despite the earlier disagreements that Pioneer and the Corps had concerning credits, on September 4, 2013, Ms. Donn e-mailed Ms. Hayes, saying "we need to formally request that the clock starts on comments on our draft so I would like to do that." DX 99 at 2 (Email exchange between Ms. Hayes and Ms. Donn). This was in reference to a revised map and table of credits for Pioneer's Edgerton parcel. We can only assume that Ms. Donn did not appreciate that the reclassification undercut the marketability of the credits. The draft mentioned in the e-mail refers to the previously re-mapped and revised ledger of Pioneer's available credits. On the same day, Ms. Hayes e-mailed back saying that "we [the Corps] do not need anything else" and asked Pioneer "[w]ill you be providing a signed request or is the email below serving as the request [for modification]?" DX 99 at 1. Ms. Donn replied "[i]f the email below is sufficient to serve as the request that would be great." *Id.*

On November 4, 2013, Pioneer's UMBI was officially modified by a letter to Pioneer sent by Colonel Christopher Lestochi of the Corps. The letter noted that the changes occurred "[b]ased on your request of September 4, 2013." JX 12 (Letter from Col. Lestochi to Pioneer). The letter included a revised table showing Pioneer's credits generated by the Edgerton parcel. In addition to an overall reduction of credits, from 151.80 to 151.60, Pioneer was given a total of 36.36 palustrine-type credits. *Id.* The majority (92.62) of Pioneer's credits were newly classified as "Riparian." *Id.*[8] The court was offered no explanation by either party for why the previously revised number of palustrine credits (16.92) became 36.36 credits. By the time of the November 2013 modification, which plaintiff seems to have requested, the ARRC credit purchase from Su-Knik and GLT was complete.

On May 5, 2014, plaintiff filed the instant case, alleging that the Corps

---

[8] The official amendment to Pioneer's UMBI called these credits "Riparian." Previous draft versions of the A-6 credit table, such as the one drafted by Ms. Donn and sent to Ms. Hayes in September of 2012, called these credits "Riparian Buffer." These terms are apparently synonymous. Ms. Donn testified that she had never previously heard of riparian buffer credits, and did not believe there was any market for them. Ms. Hayes testified that the Corps did not have jurisdiction over the upland-type lands that make up riparian buffer or riparian credits. Tr. 733. As noted by Ms. Hayes, the Corps cannot mandate mitigation for upland areas because those lands are not within its jurisdiction. There is, then, essentially no market for riparian credits because the Corps has no authority to compel mitigation for their destruction.

breached the UMBI in September 2012 when it unilaterally acted to reduce Pioneer's Edgerton palustrine credits from 124.7 to 16.92. Plaintiff further alleges that, had that breach not occurred, the Corps would have directed AARC to purchase all of Pioneer's Edgerton parcel palustrine credits. Plaintiff further argues that it would have been able to sell those credits for $89,000 each, and asks for a total of $12.6 million in damages.

## DISCUSSION

Two issues remain. First, it must be determined whether the Corps breached the UMBI in September 2012 when it directed ARRC to buy only 16.92 palustrine credits from the Edgerton parcel. A related inquiry is whether the Corps unilaterally reduced the number of credits without the written consent of Pioneer. If it is the case that the Corps unilaterally reduced Pioneer's marketable credits, such action would necessarily result in a breach of contract. Second, if a breach is found, the court must determine the proper amount of damages to be awarded to Pioneer.

*A. The Corps unilaterally reduced the number of palustrine credits available to Pioneer, thereby breaching the UMBI*

The original UMBI provided Pioneer with 151.81 credits for the Edgerton parcel, of which 124.7 credits were classified as palustrine. It is undisputed that the UMBI was in fact modified on November, 2013, apparently by the Corps and with Pioneer's consent. Upon modification, the total number of credits for Edgerton was reduced to 151.6, while the number of palustrine credits was reduced to 36.36. That modification, however, took place one year after the Corps directed ARRC to buy only 16.92 credits from Pioneer's Edgerton parcel. It is the events in September 2012, which Pioneer relies on for its breach claim.

Section VII G of the UMBI is entitled "Modifications" and reads in full:

> This UMBI may only be amended or modified with the written approval of the Sponsor and the Corps. In the event the Sponsor determines that modifications must be made in the Mitigation Plan to ensure successful establishment and operation of the Bank, the Sponsor shall submit a written request for such modification to the Corps, for approval. The Corps will

>  distribute this request to the IRT to seek their recommendations.

PX 9 at 15. Thus, it is clear that in order to modify the UMBI, both parties had to agree in writing. Unilateral modification of the UMBI would constitute a breach of this section and the contract as a whole.

When Nicole Hayes replaced Karen Nelson as the main point of contact, one of her priorities was to personally tour all of the mitigation bank properties for which she was responsible. After visiting Pioneer's mitigation bank on May 29, 2012, Nicole Hayes and her team reviewed the wetland delineation in the administrative record and confirmed that, in their view, large portions of the Edgerton parcel that were classified as wetlands should have been instead classified as uplands. Upland areas cannot generate palustrine credits. Thus, the effect of reclassifying some of Pioneer's land from wetlands to uplands reduces the number of palustrine credits available for sale by Pioneer.

The evidence shows that the Corps believed Pioneer's UMBI to have been incorrectly mapped. Although the Corps engaged in discussions with Pioneer for over a year, it unilaterally, and without Pioneer's approval, reduced the amount of palustrine credits available for Pioneer to sell. It was not until September 2013 that Pioneer consented to the modification of the UMBI. Prior to then, any talk of modification had been purely in the nature of negotiation. Although both sides exchanged revised figures and tables, nothing prior to the September 2013 e-mail exchange between Ms. Donn and Ms. Hayes can be fairly construed as Pioneer approving the modification of its credits. When the modification finally took place, it was a year after the breach.[9]

Even though the Corps' official database as of September 2012 showed that Pioneer had its original, full amount of palustrine credits, the Corps nevertheless unilaterally reduced Pioneer's credits when it directed ARRC to purchase only 16.92 of those credits from plaintiff. ARRC's permit indicated that it needed a total of 160.2 credits for the PMRE and that Pioneer's Edgerton palustrine credits were the most preferred and ecologically appropriate type of credit for offset. There is no question that, if the Corps viewed Pioneer as having more than 16.92 of these credits, it would have ordered ARRC to purchase all of them before purchasing any credits from Su-

---

[9] The government has not argued that modification of the UMBI in November 2013 constituted a waiver by Plaintiff of the prior breach.

Knik. Accordingly, the court finds that the Corps breached the UMBI when it directed ARRC to purchase only 16.92 palustrine credits from Pioneer at a point when no modification to the contract had yet been made.

*B. Plaintiff Cannot Prove That It Would Have Sold All Its Mitigation Credits In The Non-Breach World*

Having determined that the actions of the Corps lead to a breach of the UMBI, the court now turns to the issue of damages. Plaintiff contends that, had the Corps not unilaterally acted to reduce the overall number of palustrine credits it had available, the permit issued to ARRC would have ordered ARRC to purchase all of Pioneer's palustrine credits, and that it would, in fact, have sold all of those credits to ARRC. Plaintiff asks for $89,000 per credit in damages for a total of $12,655,800, based upon a presumed sale of 160.2 credits, the number of credits the railroad needed.[10]

It is notable that plaintiff offered no alternative scenario for damages other than the sale to the railroad and no alternative valuation method than the use of its advertised pricing schedule. This is perhaps understandable because, although the mitigation credits have real value, the owner's ability to exercise those credits is controlled by the Corps. In this instance, during the approximately one year period between breach and modification, plaintiff offers evidence of only one project for which the Edgerton credits would have had any utility–the PMRE.

To support its credit pricing, plaintiff offered the expert report and testimony of Charles Thompson, the co-owner and principal of Eco-Capital Advisors, LLC, a financial advisory and private equity firm based in Atlanta, Georgia. In his career, Mr. Thompson has been involved in hundreds of individual transactions involving the sale of mitigation credits. Defendant proffered Dr. Benjamin Guillon as its expert witness. Dr. Guillon is currently the managing director of the conservation finance department at WRA, Inc., a consulting group for developing and managing mitigation and conservation banks, and spent three years as the head of the company's mitigation banking department. Dr. Guillon testified that he has personally supervised the development and management of over 10 mitigation banks and conducted due

---

[10] It is not clear why plaintiff would use the total number of credits the railroad needed, when the maximum number of palustrine credits available from the Edgerton parcel was 124.7.

diligence on over 100 different mitigation banks. The court found both Mr. Thompson and Dr. Guillon to be credible expert witnesses.

Mr. Thompson looked to several factors in reaching his conclusion that $89,000 represented a fair market value for one of Pioneer's palustrine credits, and that the range of values for one of Pioneer's credits was $79,000 to $167,000. PX 64 at 11 (Plaintiff's Expert Report). First, Mr. Thompson looked at historical credit sales in the region, including the Anchorage bowl area. While noting that land in the Anchorage area generally represented higher value property than land in the Matanuska-Susitna Borough where Pioneer's land is located, Mr. Thompson believed that Pioneer's land was more comparable to land in the Anchorage bowl area due to the fact it was fully developable for residential and/or commercial use. *Id.* Because in-lieu fee generated credits had been sold by GLT for Anchorage bowl projects for $167,000 per credit, Mr. Thompson believed that value to be the high end of the range for Pioneer's credits. Mr. Thompson next looked at the underlying tax-assessed land value. Based on the knowledge that ARRC thought it was reasonable to pay Su-Knik $10,000 per credit, Mr. Thompson looked to the average per acre tax assessed value for Su-Knik's land, which he determined to be $426. He then divided $10,000 by $426 and found that the credits were priced at a multiple of approximately 23 times the underlying land's taxed assessed value. Applying this same multiplier to Pioneer's tax assessed value per acre of $4,969, this would place a value of approximately $114,000 per credit on Pioneer's palustrine credits. PX 64 at 12.

Mr. Thompson finally looked at credit sales completed by Pioneer (two sales of palustrine credits to the Alaska DOT for $79,000 per credit), and Pioneer's pricing schedule, which would have yielded a value of $89,000 per credit based upon a sale of 160.2 credits. PX 64 at 12. Mr. Thompson also opined that he did not think the pricing offered by Great Land Trust ($29,000 per in-lieu fee advance credit) was a proper comparison to Pioneer's credits because Pioneer offered mitigation credits while GLT offered credits as an in-lieu fee provider. He also opined that, when looking at mitigation costs as an overall percentage of the budget of a project, a cost of $89,000 per credit would have been within the industry standard. PX 64.

Dr. Guillon, on the other hand, opined that, as of September 10, 2012 (the date the permit was issued), Pioneer's credits were worth between $12,217 and $29,084 per credit. DX 125 at 4 (Defendant's Expert Report). In reaching this conclusion, Dr. Guillon looked at the price points of potential competitors

13

(in this case, GLT's sale of in-lieu fee credits to ARRC at $29,084 per credit and Su-Knik's pricing of $10,000 per credit), as well as a discounted cash flow valuation, which looked to Pioneer's price structure and reasonable revenue expectations. *Id.* at 18. Dr. Guillon looked to all of Pioneer's expenses associated with starting the mitigation bank such as consulting fees, the loss of value in the land as a result of restricting it with an easement, and the cost of ongoing maintenance and taxes. He also considered the discount rate, which is the target nominal internal rate of return a mitigation bank would expect to get on its investment. *Id.* at 25. After looking at a variety of risk factors, Dr. Guillon concluded that 25% would be an appropriate nominal discount rate. *Id.* at 26. Based on this, Dr. Guillon concluded that an investor seeking to generate an annual return of 25% on his investment in Pioneer's land would have priced each credit at $12,217. *Id.*

It is unnecessary for us to resolve the disagreement between Mr. Thompson and Dr. Guillon. Even if Mr. Thompson's figures can be justified, the fact is that plaintiff had competition in September 2012 from at least two other sources willing to undercut its prices. The railroad was not obligated to pay more than it had to, and indeed, it took the position that doing so would run afoul of state procurement regulations. The critical flaw in plaintiff's attempt to prove damages is that it has not made a showing that, absent the breach of contract, it would have been able to sell any, much less all of its Edgerton parcel palustrine credits to ARRC for $89,000 per credit. In a non-breach world, Pioneer would have had 124.7 palustrine credits available for sale from its Edgerton parcel. Yet, despite over five months of negotiation regarding the price of credits, Pioneer and ARRC could not consummate the sale of even 16.92 credits. On September 17, 2012, Pioneer's initial offer was sent to ARRC, and the offer proposed the sale of 16.92 palustrine credits for a total of $2,496,000.00, or an average price of $146,823.53 per credit. DX 50.13. This offer was rejected by ARRC because ARRC believed the price was too high. On January 22, 2013, ARRC sent out its final quotation request to, among others, Pioneer. DX. 78.1 On January 25, 2013, Pioneer e-mailed its final offer to ARRC, in which it proposed to sell the credits for a price of $122,576.83 per credit, a total of $2,074,000.00. JX 10. This price was over four times as expensive as the next highest offer, $492,101.28 (an average of $29,084 per credit) from GLT. JX 9.

In support of $89,000 as a plausible price, plaintiff points to the fact that, in 2013, it sold approximately five palustrine credits to the Alaska Department of Transportation for a price of $79,000 per credit. We disagree.

14

Assuming that the Corp would order ARRC to first purchase all of Pioneer's Edgerton palustrine credits, that is only 124.7 credits and still short of the 160.2 credits ARRC was required to purchase. ARRC would then have to purchase the remaining balance of credits from Su-Knik as the second most preferable option. Using Pioneer's tiered pricing schedule, the price for 124.7 credits would be $12,140,800 total, or $97,360.06 per credit. It is unlikely that ARRC would have agreed to purchase credits for $89,000, or even $79,000, much less $97,360.06, given its knowledge that Su-Knik was selling mitigation credits for $10,000, not to mention its requirement to comply with state procurement rules. DX 69.1.[11] Dr. Guillon reached this same conclusion in his expert report, noting that "if ARRC had been directed to purchase 160.2 credits from Pioneer reserve at $90,287.14 per credit, which is almost 10 times as many as ARRC refused to purchase at $88,094.12 per credit, there is strong reason to think that ARRC would have sought a modification and initiated a bidding process, similar to the process that was later initiated by ARRC for the 16.92 credits." DX 125.16.

In the breach world, after months of negotiations with ARRC, Pioneer faced making a do-or-die offer for the sale of 16.92 credits. It offered those credits for $122,576.83 per credit, and did so knowing that, if an agreement was not reached, it would lose out on the opportunity to sell these credits to ARRC. The simple fact is that Pioneer was unwilling to lower its price into a range that ARRC would have found acceptable. Accordingly, plaintiff has failed to adequately prove a non-breach world in which Pioneer and ARRC would have reached a deal for the sale of 124.7 credits at $89,000 per credit when, in the breach world, they could not even consummate a deal for 16.92 credits. The breach did not cause that loss. Plaintiff chose to build its damages model around its own pricing schedule without taking into account the fact that it was responsible for electing not to consummate a deal at a price ARRC was willing to pay. Having been presented no alternative means of measuring the damage caused by the breach, we must conclude that plaintiff has not proven that it suffered any damage.

We sympathize with plaintiff's difficulty in proving damages for breach of contract with respect to a property interest as unique as mitigation credits. In some respects what the agency did here sounds more in the nature of a taking of property, or interference with a business relationship, or improper

---

[11]ARRC specifically mentioned AS 36.30. Title 36 is entitled "Public Contracts" while Chapter 30 is entitled "State Procurement Code."

15

administrative action. But the underlying relationship here is, indeed, generated by a contract, making a constitutional taking approach problematic (and, in any event, unasserted); interference with a business relationship is a tort over which this court would not have jurisdiction and which in all likelihood would run afoul of government defenses in a Tort Claims Act[12] proceeding; and we previously held that the plaintiff could not proceed in this court with a challenge to the agency's actions in reexamining the classification of the land included in the mitigation bank.[13] We note as well, that it would have been impossible to assert a breach of contract claim after November 2013, when Pioneer consented to a modification to the UMBI. Plaintiff was thus boxed into a contract proceeding for events prior to the agreed-upon modification, but it then elected to frame its damages claim entirely around a lost sale opportunity with the railroad. The fact that both experts thus attribute *some* value to the extinguished credits does not advance plaintiff's claim, which was an all-or-nothing approach built on an unproved assumption–that the sale to the railroad would have been consummated, but for the breach.

## CONCLUSION

For the reasons set forth above, the court finds that, although defendant breached the UMBI when it acted unilaterally in reducing the number of available credits that plaintiff had available for sale, Pioneer has not proved that, in the non-breach world, Pioneer and ARRC would have come to an agreement for the sale of credits.  Accordingly, plaintiff has failed to prove damages and we must award judgment for the defendant. The clerk of court is directed to enter judgment accordingly.  No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[12] 28 U.S.C. § 1346(b) (2013).

[13] In *Pioneer II*, the court rejected the plaintiff's attempt to challenge the actions of the Corps, holding that "we agree with defendant's argument that the regulations afford the Corps some level of discretion, which insulates its PMRE permit decision from collateral scrutiny in an action here for damages." *Pioneer II*, 125 Fed. Cl. at 118.